### ACTION FOR MALPRACTICE.

Circuit Court of Cuyahoga County.

CLIFTON D. ELLIS v. CHARLES R. TWIGGS.

Decided, January 17, 1910.

*Wrongful Death—Malpractice—Discretionary Courses of Treatment—Question for Jury—Substantial Damage Upon Showing of Relationship to Deceased—Interrogatories—Expert Evidence—Comment on Same by Court.*

1. While an action for malpractice can not be successfully founded upon a claim that the physician has taken one of two discretionary courses, concerning the relative propriety of which doctors disagree, yet when the propriety of the course actually taken is challenged, the question is one for the jury to determine as to whether the course taken was improper, so as to manifest want of ordinary skill and care, or whether its propriety is, under the evidence, a discretionary question.

2. In an action for wrongful death it is unnecessary to show more than that the deceased bore the relation of wife and mother to the persons for whose interest the action is brought, in order to authorize substantial, as distinguished from nominal damages.

3. Interrogatories must be directed to the ascertainment of the jury's mind concerning facts in issue; not merely ultimate facts, but determinative facts. It is sufficient if they are of such a nature as that the answer to them, when deliberated upon and returned by the jury, shall tend to test the correctness of the general verdict.

4. It is improper to suggest to the jury that expert witnesses might, through inattention, fail to comprehend the true meaning of hypothetical questions put to them.

*Foran & Powell,* for plaintiff.

*Walter D. Meals,* contra.

HENRY, J.; WINCH, J., concurs.

The parties to this proceeding in error stand in the relation opposite to that in which they stood below. There Twiggs brought his action against Dr. Ellis for wrongfully causing the death of the former's wife and intestate, by obstetrical malpractice. Mr. Twiggs consulted Dr. Ellis about the last of March, 1905, and upon examination he found that she was threatened with involuntary abortion.

The threatened event occurred on or about April 5. The afterbirth was not removed until about April 9th, its removal being, as Dr. Ellis claims, impracticable until that time.

Afterwards, between April 12 and 29th (one witness positively fixes the former date; see bill of exceptions, page 198), Mrs. Twiggs exhibited some of the characteristic symptoms of blood poisoning, i. e., chills and fever. On the latter date she went with her husband to the doctor's office. He, finding that she was suffering from fever, ordered her to go home and to go to bed and stay there. This she did, languishing until her death, June 17, following. Dr. Ellis was in attendance upon her most if not all of this time, although it appears that about the middle of April his patient seemed to be better, so that she determined to dispense with his services and with those of her nurse. The dates as fixed by different witnesses are so confused, that we can say nothing with positiveness as to the actual facts in regard to these details.

A verdict and judgment of $1,500 were recovered against Dr. Ellis.

The errors alleged by him are:

1. The verdict is unsupported by the evidence, both as to fact of liability and the amount of the damages.

2. The refusal of the court to submit to the jury this interrogatory: "When did the decedent first manifest fever or chill, as a sympton of the infection of which she died?"

3. The charge of the court concerning expert witnesses, as follows:

"Much of the evidence in this case has been the evidence of experts, what we call expert witnesses. Witnesses who have particular learning or experience of knowledge about matters that

are involved in the trial of the case, are called here to give their opinions, based upon a given state of facts, and many of those expert witnesses never saw this woman perhaps; they gave their opinion here based upon a statement of facts as claimed by counsel to have been proved by their witnesses.    Expert testimoney has some peculiar qualities.   It is possible sometimes that expert witnesses may not be put in full possession of the case as it really is before the jury.   Some omissions of counsel in stating a hypothetical case, some inattention of the witness in listening to it, if it is a long question—there is always some—and possible at least, that there may be some slip of that kind.    I don't say that there was any such thing occurred in this case, but that liability, however slight, as it may be, attends more or less the introduction of expert testimony.   Sometimes an expert witness takes an interest in one side of a case or in another. He wants to help somebody or to hurt somebody, and his opinion may be more or less warped, just as the testimony of other witnesses may be more or less warped by interest or by desire to have a certain result to the case.   Some expert witnesses may be more intelligent than others.   Some have had more experience than others.   Some show from their testimony that they have a better grasp of the case that is put to them than others, and so the testimony of expert witnesses and the value of it may vary—may differ.   Now I mention these things not to discredit expert testimony at all, but to enable you gentlemen to weigh that class of evidence, as it is not very frequently that you are called upon to consider that class of evidence, and I have stated these things to enable you to weigh these expert witnesses and their testimony as it should be weighed.   The testimony of an expert witness may, for various reasons, be of little value: may not be so reliable as that of another; may be for want of experience or ability, and so on.   Other expert witnesses may render the jury more valuable service.   Men who are candid and capable and clear in their statements, showing that they comprehend the situation, may give the jury very valuable assistance so now I will leave that kind of testimony for your consideration, with these suggestions for your guidance.''

4.   The plaintiff in error also complains of the admissions of sundry hypothetical questions as embracing matters not in evidence.

Concerning the first of these assignments of error, the evidence discloses that it is dangerous to leave the after-birth undelivered for as long a period as four days after the delivery of

the foetus, in cases of abortion, because it is liable to occasion infection or blood poisoning.    True, some of the physicians say that under the circumstances which Dr. Ellis testifies existed in this case the procedure in question was proper; but other physicians testify that it is improper in any case.    While it is undoubtedly true that an action for malpractice can not be successfully founded upon the claim that the physician has taken one of two discretionary courses concerning the relative propriety of which doctors disagree, yet when the propriety of the course actually taken is challenged, as in this case, the question is one for the jury to determine as to whether the course taken was improper, so as to manifest want of ordinary skill and care on the part of the physician, or whether its propriety is, under the evidence, a discretionary question.    The true doctrine should of course be presented to the jury in the charge, and no complaint is made of the charge in this behalf in the case before us. We can not say, from the evidence, that the jury were wrong in finding that the conduct of Dr. Ellis in this case was irreconcilable with the exercise by him of ordinary skill and care as a physician.    If the case were originally presented to us, we might essay a decision, but our province is solely to determine whether the jury had any substantial evidence on which to found the verdict at which they arrived.

It is claimed, however, that upon the facts of this case it is apparent that the blood poisoning originated from some other cause than the delay in removing the afterbirth.    It appears to be agreed that infection declares itself within three days after exposure thereto, and Dr. Ellis claims that the first appearance of infection in Mrs. Twigg's case was nearly three weeks after the removal of the afterbirth.    But, as already stated, one witness positively declares that on April 12, while Dr. Ellis was still in attendance upon his patient, and before his alleged dismissal by her, Mrs. Twiggs was suffering from a chill, and there is some testimony at least that the condition of the afterbirth when removed was such as to compel the inference of infection already declared at that time.    Moreover, Dr. Ellis himself signed the death certificate in which he had written as the

"cause of death: Placenta-Previas (?) auto-infection, duration twelve weeks. Contributory cause of death: Sepsis, duration eleven weeks." While the duration of cause, or contributory cause of death as thus given by Dr. Ellis is too great to support his own theory, it is likewise too great to support the theory of the plaintiff. It is however significant that the difference of duration is but a week between the inception of the cause of death to-wit, auto-infection, superinduced by some condition of the placenta, or afterbirth, and the appearance of the contributory cause of death, to-wit, sepsis or blood poisoning. Dr. Ellis now says that this interval was three weeks instead of one. It seems to us that while this death certificate is by no means conclusive of negligence or unskillfullness, it is pretty nearly conclusive as to the origin in both time and cause of the condition which resulted in the patient's death. All in all we are not prepared to say from a consideration of this record alone that the verdict is either unsupported by any evidence, or contrary to the weight of the evidence.

As to the measure of damages it is claimed that nothing is shown in the evidence regarding any actual pecuniary damages sustained by any of the next of kin, the husband and children of the deceased. We think it is unnecessary to show anything more than the fact of wifehood and motherhood to authorize substantial as distinguished from nominal damages.

See *Railway Co.* v. *Murphy,* 50 Ohio St., 135; *St. Railway Co.* v. *Altemeier, Admx,* 60 Ohio St., 10.

Concerning the request for a special finding, we think it should have been granted. The time when the infection first declared itself was as already shown, a most important fact of the case. It is perhaps true that the most favorable answer from Dr. Ellis' standpoint to the question thus sought to be asked of the jury in his behalf would have involved no such inconsistency with the general verdict against him as to require or warrant the granting of a motion for judgment *non obstante veredicto,* if interposed by him. But this is not the exclusive test to be applied in passing upon a request to submit interrogatories to the jury. It is true, of course, that misleading interrogatories

should not be submitted, nor those which relate merely to processes by means of which the jury arrive at their general verdict.

The interrogatories must be directed to the ascertainment of the jury's mind concerning facts in issue, not merely ultimate facts, but determinative facts. It is sufficient if they are of such nature as that the answer to them, when delivered upon and returned by the jury shall tend to test the correctness of the general verdict. *Electric Ry. Co.* v. *Hawkins,* 64 Ohio St., 391; *Gall* v. *Priddy,* 66 Ohio St., 400.

The interrogatory in this case, we think, would have tended to test the correctness of the general verdict and it should therefore have been submitted. To refuse to submit it was error.

Concerning the third assignment of error, the charge of the court on expert witnesses, we note particularly this sentence: "Some omissions of counsel in stating a hypothetical case, some inattention to the witness in listening to it, if it is a long question —there is always some—and possible at least that there may be some slip of that kind."

All the witnesses of the defendant below were physicians. The hypothetical questions asked of them were necessarily long, much longer than those which the theory of the plaintiff below required in the case of the hypothetical questions propounded to his expert witnesses. The statement quoted from the charge was therefore discriminatory against the defendant's witnesses. We think it was improper to suggest to the jury that these expert witnesses might, through inattention, have failed to comprehend the true meaning of the questions put to them. Experts are called because of their superior learning and intelligence in some direction, and a professional expert can not be presumed to be any less likely to comprehend the meaning of a question, long though it may be, than any other witness. To ascribe inattention to them, even by way of suggestion, may well mislead the jury into speculation concerning the unreliability of expert testimony, even within the sphere of its conceded value. See *Insurance Co.* v. *Howell,* 68 Ohio St., 614, 622; *State* v. *Tuttle* 67 Ohio St., 440 (4th paragraph of the syllabus).

We think the court erred in intimating that there may have been some inattention on the part of the expert witnesses in listening to any hypothetical questions.

Concerning the fourth and last error assigned, we content ourselves with the remark that the hypothetical questions objected to and allowed to be put to witness by plaintiff below are not so plainly inclusive of facts, for which there is no evidence, as to warrant our finding error in the overruling of the objections made thereto.

Upon the whole record we find no error, except as already noted, to-wit:

1st.   In refusing to submit the interrogatory to the jury as requested by the defendant below.

2d.   In charging the jury that expert witnesses may have been inattentive to some elements in long hypothetical questions.

For these two errors the judgment of the court of common pleas is reversed and the cause remanded for a new trial.